Joynes, J.
The order of this court, upon the petitions for a rehearing of these causes under the second section of the “enabling act,” passed March 5, 1870, by which the rehearing was refused, having been sus *104 pended on the application of the petitioners, the petitions come on now to be finally disposed of. I did not file an opinion when the petitions were disposed of in November, and I propose, therefore, to state briefly the grounds of my opinion. Upon a question of such novelty and gravity, I should at any time speak with diffidence, in opposition to the opinion of two of my honored brethren, especially when the result of my opinion is to overrule a provision of an act of assembly. It is a trite observation, but a perfectly just one, that while it is undoubtedly within the competency of the courts to overrule an act of assembly which exceeds the power of the Legislature, under the constitution, it is a power to be exercised with great caution, in deference to the opinion of the Legislature, and only when the excess of authority, on the part of the Legislature, seems to be beyond question. At the same time, it must be conceded that such an authority in the judiciary is essential to maintain the paramount control of the constitution, and that whatever deference is due to the opinion of the Legislature, still higher deference is due to the constitution.' In the exercise of this power, we do not set ourselves against the Legislature; we do not arrogate superiority over that department of the government, to which we are only co-ordinate; we do no more than perform our ordinary function of deciding what is the law of the case before us. It is the plain duty of the court to consider and determine such questions with firmness and according to their best judgment, always remembering that nothing is more essential to the public welfare than a strict adherence to the constitution. The Legislature performs its duty according to its own sense of what the constitution allows or requires; and so we must perform ours.
The term of the Court of Appeals at which the decrees we are asked to review were rendered, closed on the 25th day of February, 1870. Whatever doubts ex *105 isted at a former period, it has long been the settled doctrine of this court, that it cannot set aside a final judgment or decree after the expiration of the term at which it is rendered. Reid’s Adm’r v. Strider’s Adm’r, 7 Gratt. 76; Robinson v. Allen, March, 5, 1855; Edmunds v. Hicks, January 20, 1860.
This principle is recognized by the provision of the Enabling act which I am now to consider, which undertakes to give to this court authority to review and set aside judgments and decrees rendered at the term which ended on the 25th day of February. The Enabling act was not passed until the 5th day of March, 1870. If the decrees and judgments rendered at that term were valid in themselves, and without the support of the Enabling act, it was not competent for the • Legislature, by an act passed after the expiration of the term, to set them aside, or to confer authority upon us to do' so. This proposition rests upon the soundest principles, and is sustained by the amplest authority, as is fully shown in the opinions of my brethren Christian and Staples, delivered at the hearing in November. As far as I remember, this position was not seriously ■controverted, if controverted at all, in the argument.
It was contended, on behalf of the petitioners, that the judgments and decrees rendered by the Court of Appeals after the 26th day of January, 1870, when the State was admitted to representation in Congress, were wholly void in themselves, for want of any authority in the gentlemen who acted as judges; that the Legislature had power to confirm such void judgments and decrees, either absolutely or sub modo-, that, by the Enabling act, it did confirm absolutely the judgments and decrees of all the inferior courts, while it only confirmed, sub modo, the judgments and decrees of the Court of Appeals, rendered at the term commencing •on the 11th day of January, 1870; and that the rehearing now asked from this court is authorized by the pro *106 viso annexed to the confirmation of these latter judgments and decrees.
It does not seem to me to be altogether certain, from a critical reading of the act, whether such was the view of the Legislature; but it is not important to go into that question. The important question is, whether,, supposing that the decrees in question were null and void when rendered, it was competent for the Legislature, by the Enabling act, to confirm them and make them lawful and valid, either absolutely or sub modo. If they could be confirmed and made valid absolutely,, then I presume they might be confirmed sub modo, with a right to a rehearing in this court. If they could not be confirmed or made valid at all, then there is nothing for us to rehear, no decree to be “set aside or annulled or affirmed,” in the language of the statute. Then is every judgment or decree of the Court of Appeals, rendered after the 26th January, 1870, and every judicial act of any inferior court, after the 26th January, 1870, and prior to the 5th day of March, 1870, null and void.
To render a judgment or decree is a judicial act. It is one,, which the Legislature cannot perform. The province of the courts is to decide what the law is, or has been, and to determine its application to particular facts, in the decision of causes. The province of the-Legislature is to declare what the law shall be in the future. And neither of these departments can lawfully invade the province of the other. This not only results from the nature of our institutions, but it is enjoined by an express provision of the constitution, which declares that “the legislative, executive and judiciary departments shall be separate and distinct, so that neither exercise the power belonging to either of" the others.” Article 2.
We have the case, then, as contended, of decrees-rendered by persons pretending to be judges, but hav *107 ing no authority, of color of authority, and which are, for that reason, absolutely null and void. The Legislature subsequently declares that these pretended de- ' crees, which have no' legal validity, shall be deemed valid and binding decrees. If they were thereafter to be deemed valid, is it not plain that they owe their validity to the statute alone ? It is not a case in which the Legislature cures an- irregularity in proceedings in a court having jurisdiction of the case, and held by judges having lawful authority, or color of authority. It is a case in which the Legislature undertakes to supply a total want of authority, or of color of authority, in those who pretended to act as judges. Such persons assembled together could not form a court. They could have no jurisdiction to try and decide a case judicially; so that the Legislature has undertaken to make a decree when there was no jurisdiction in the persons who undertook to decide the case; when, in short, there was no court that could lawfully decide any case. If the Legislature could confirm the void act of these pretended judges, as they are called, why may it not confirm the void act of any other person who undertakes to hold a court and decide a case ? Why might not a legislature, if one could be found corrupt enough or lawless enough, confirm the act of a mob which resolved itself into a court, with a grand jury and petit jury, and convicted a man of murder? What could be said against the power to confirm such a judgment, that cannot be said against the power to confirm the decrees now before us, on the hypothesis that the judges who rendered them had no authority or color of authority, and that their acts were null and void as judicial acts?
There are many cases in which statutes have been sustained which undertook to give validity to legal proceedings, notwithstanding irregularities apparent in them. The subject is fully discussed, and the cases *108 collected, in Cooley on Constitutional Limitations, chaP* "V* and SI. On p. 107 the author says: “These statutes may as properly be made applicable to judicial as to ministerial proceedings, and although, when they refer to such proceedings, they may at first seem like an interference with judicial authority, yet, if they are only in aid of judicial proceedings, and tend to their support by precluding parties from taking advantage of' errors which do not affect their substantial rights, they cannot be obnoxious to the charge of usurping judicial power. The Legislature does or may prescribe tbe ril^-es uni^er which the judicial power is exercised by the courts, and in doing so it may dispense with any of those formalities which are not essential to the jurisdiction of the court; and whatever it may dispense with by statute anterior to the proceedings, we believe it may also dispense with by statute after the proceedings have been taken, if the court has failed"to observe any of those formalities. But it would" not be competent for the Legislature to authorize a court to proceed and adjudicate upon the rights of parties, without giving them an opportunity to be heard before it; and for the same reason it would be incompetent for it, by retrospective legislation, to make valid proceedings which had been had in the courts, but which were void for want of jurisdiction over the parties. Such a legislative enactment would be doubly objectionable—-first, as an exercise of judicial power, since the proceedings in court being void, it would be the statute alone which would constitute an adjudication upon the rights of the parties; and, second, because in all judicial proceedings notice to parties and an opportunity to be heard are essential; both of which they would be deprived of in such a case. And for like reason a statute validating proceedings had before an intruder into a judicial office, before whom no one is authorized or required to appear, and who could have jurisdiction neither of the *109 parties nor of the subject matter, would also be void.”
In McDaniel v. Correll, 19 Illi. R. 226, cited by Cooley, a statute had been passed to render valid certain legal proceedings against non-residents, over whom the court had not obtained jurisdiction, whereby an alleged will was adjudged to be void. The court said, among other things: “If it was competent for the Legislature to make a void proceeding valid, then it has been done in this ease. Upon this question we cannot for a moment doubt or hesitate. They can no more impart a binding efficacy to a void proceeding than they can take one man’s property from him and give it to another. Indeed, to do one is to accomplish the other.” What difference, I ask, can it make, that the proceedings are void, for the reason that the persons who undertook to act as judges had no jurisdiction, or power to acquire jurisdiction, over anybody? The principle is, that if the proceeding is null and void, and not merely defective or irregular, it cannot be confirmed, and it can make no difference on what ground it is thus null and void. If such pretended judges adjudge the property of one man to another, nothing passes by force of the judgment. When the Legislature undertakes to render this judgment valid, does it not undertake “to take one man’s property from him and give it to another” as fully as in the case cited? This general subject is elaborately discussed, and the same doctrine laid down, in Denny v. Mattoon, 2 Allen R. 361, also cited by Cooley.
It has been said, in support of the power of. the Leg- ' islature to confirm the void decrees in these cases, that subsequent ratification is equivalent to original authority; and that, therefore, the Legislature may ratify, by subsequent confirmation, the exercise of a jurisdiction which it might have authorized beforehand; and the case of Thomsen v. Lee County, 3 Wall. U. S. R. 327, was cited to support the proposition. I have not' *110 access to Thomson v. Lee County as I write, but I have before me tbe case of Beloit v. Morgan, 7 Wall. U. S. R. 619, which is a case of the same character, and was decided upon the authority, in part, of Thomson v. Lee County. In Beloit v. Morgan the Legislature had authorized the town of Beloit to subscribe to the capital sfoc-h of a railroad company, and to pay for the subscription in the bonds of the town, payable at the ex-pirsdiori of a term named, and at a rate of interest specified. Bonds were issued by the supervisors, professing to execute the authority conferred by this act. ^ became a question whether the bonds were issued in conformity with the act. The town insisted that they were not so issued, but were issued in violation of the act, and without legal authority, and constituted a corrupt and usurious contract, and refused to pay them. Subsequently the Legislature passed an act providing that the whole principal and interest of those bonds should be paid. In Beloit v. Morgan, the question arose as to the effect of this provision. The Supreme-court said: “ This is not an open question in this court. Whenever it has been presented, the ruling has been, that in cases of bonds issued by municipal corporations under a statute upon the subject, ratification by the Legislature is, in all respects, equivalent to original authority, and cures all defects of power, if such defects existed, and all irregularities in its execution. [Citing Gelpcke v. Dubuque, 1 Wall. U. S. R. 175, 220, and Thomson v. Lee. County, 3 Id. 327.] The same principle has been- applied in the courts of the States. [Citing 1 Maryland ch. 56; 5 Gray 180.] This court has repeatedly recognized the validity of private and curative statutes, and given them full effect where the interests of private individuals were alone concerned, and were largely involved and affected.” [Citing Satterlee v. Matthewson, 2 Peters 380; Wilkinson v. Leland, Id. 627, and other-cases in the Supreme court.]
*111 Beloit v. Morgan, and Thomson v. Lee County, were ■cases of contracts deliberately entered into, and professedly under authority of a statute, though not conformity with its terms; of which the obligors had received the benefit, and which justice and good conscience required them to fulfil. The effect of the statute, in such case, was to support the intention of the parties and the equity of the contract. Cases of this kind are numerous. The principles on which such statutes are sustained, and the extent to which such legislation may go, are fully discussed and explained in the 5th and eleventh chapters of Cooley, already referred to. These principles, I submit with deference, have no application to such cases as are now before us. Here is no case of contract improperly or irregularly entered into; no case of judicial proceedings conducted irregularly. It is, according to the view I am considering, the case of decrees which were not merely irregular, but null and void, when they were rendered, and in which it is claimed that the Legislature has power to give them validity, by a statute subsequently passed. The question is, whether a statute designed to give validity to such void decrees, is not the exercise of judicial power, and, therefore, unconstitutional and void. Ho thing, it seems to me, can be clearer than this.
I submit, therefore, that it is clear, that if the decrees before us were void when rendered, from the want of authority in those who rendered them, to render any decree whatever, they are void now, as they were at first, because it was not in the power of the Legislature to make them valid by confirmation.
It might be suggested, perhaps, that this difficulty might be gotten over, by construing the Enabling act as giving a right of appeal from the decree of the Circuit court. But that will not do. Such is not the provision of the statute. And it might happen that a *112 party, who would desire a rehearing and review of the decree of the Court of Appeals, would not desire an appeal from the decre.e of the Circuit court. That is always so when the decree of the Circuit court is reversed by the Court of Appeals.
I do not think it necessary to go into the question, whether these decrees were valid or void when they were rendered, if I am right in the viewsT have been presenting. But, perhaps, I ought not to pass that question by.
I am not of opinion that the gentlemen who sat in this court, under the military government, had any title, on general principles, to retain their positions until judges should be elected and qualified under the constitution. Their title expired on the 26th January. By this I mean that, on general principles, they had no title that they could set up against the power of the Legislature to supply their places. I say nothing now of their right to hold over by sufferance. This is in accordance with our decision in the case of The Mayoralty, 19 Gratt. 673, and the principle is well sustained by authority. 8 Louis. Ann. Rep. 122; 4 English Rep. 283; 24 Ark. R. 78; 44 Maine R. 406; 2 Maryl. R. 341; 9 How. U. S. R. 235; 14 Ib. 227. And this principle has been generally, if not universally, recognized and acted upon in the conventions in which constitutions have been framed for the States. The usage has been to provide for the case by a provision in the body of the constitution, or in a schedule, so that the State may not be without officers in the interval which necessarily elapses between the expiration of the former constitution and the election or appointment of officers under the new one. See 8 Louis. Ann. Rep. 122.
The convention by which our present constitution was framed, commenced its session on the 3d day of December, 1867, and adjourned on the 17th day of April, 1868. The first reconstruction act was passed *113 on the 2d day of March, 1867, and the powers of the military commander had been enlarged to their utmost extent, in respect to the removal and appointment of officers, by the act of July 19, 1867. There had, no doubt, been some removals and appointments before the assembling of the convention, and many more before its adjournment. Gov. Peirpoint was removed, and Gov. Wells appointed in his place during the session of the convention. There was every reason to expect that removals and appointments would become still more numereus. Gen’l Schofield, who was then commanding the district, used his power of removal and appointment with a rather sparing hand. But there was a great clamor in Congress and out of it, and as much in Virginia as elsewhere, among a certain class of citizens, in favor of a general removal of all officers who could not submit to the test oath prescribed by the act of July, 1862, known as the “ iron-clad ” oath. This agitation culminated, in February, 1869, in a joint resolution of Congress, requiring such a general removal of officers. The convention, of course, knew the power of the commanding general in respect to the removal and appointment of officers, and they must be presumed to have known of the agitation in favor of a general removal.
The convention recognized the necessity of a schedule to bridge over the interval between the termination of the military government and the organization of the government under the constitution, and accordingly one was adopted. Among its provisions was this: “ The several courts, except as hereinafter provided, shall continue with the like powers and jurisdiction, both in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department of this constitution.” Section 4 of the schedule is in these words: “ That all recognizances, bonds, obligations, and all other instru *114 ments, entered into or executed before tbe adoption of ' this constitution, to the people of the State of Virginia, • to any State, county or township, or any public officer or public body, or which may be entered into or executed under existing laws, to ‘ the people of the State of Virginia/ to any such officer or public body, before the complete organization of the department of government under this constitution, shall remain binding and valid, and rights and liabilities upon the same shall continue, and may be prosecuted as provided by law. All crimes and misdemeanors and penal actions shall be tried, punished and prosecuted, as though no change had taken place, until otherwise provided by law.”
In what sense is the word “ courts ” used in the second section of the schedule ? The word “ court,” as is well known, is often used to describe a legal tribunal, in an abstract sense, without a judge, and it is as often used to describe the tribunal with the judge. So we often speak of the judge, while presiding in the tribunal, as “the court.” The sense in which this word is used in the schedule, must be ascertained by construction. The question is, what did the convention intend ?
If the word “ courts ” was used to describe the tribunals in an abstract sense, without the judges, the intention must have been that they should not sit, for they could not sit without judges. What could be the reason for continuing over these naked, abstract tribunals, without any power to act? These would be naked, abstract tribunals, without such a provision. Courts were provided for by the constitution, though they could not act until judges were elected or appointed for them. These tribunals could do no conceivable good as long as they remained thus dead and powerless; what more good could be done by the old tribunals continued over, in the same lifeless and powerless condition ? The courts are continued over “ with the *115 like powers and jurisdiction.” Of what use could it be to continue the “powers and jurisdiction” of the •courts, if they could not be exercised? What good could that accomplish to anybody ?,. The courts are to be continued “until the organization of the judicial department of this constitution.” The judicial department was established by the constitution; it could not be said to be organized until judges were elected or appointed to carry it on. The “courts” then were to be continued until judges should be elected under the constitution. Does not this indicate that the intention of the convention was to provide judges to administer justice, until other judges could be provided, under the constitution, to take their places ? Why continue the courts over, until judges under the constitution should be appointed, except that the object of the provision would then be spent; the means of administering justice would then be provided from another source? The meaning seems to me to be, that the courts, as organized when the constitution shall take effect, shall continue, &c., until the organization of the judicial department under the constitution: that is to say, one organization shall continue, with all its powers and jurisdiediction, until another is ready to take its place and perform the same duties.
There was an obvious propriety—nay, there was a necessity—to supply judges for this tribunal. It was unavoidable that occasions for their services should frequently occur, to prevent the greatest injustice and •oppression, against which there could be no other relief. Writs of habeas corpus, appeals, writs of error, •injunctions, must frequently be demanded by the most urgent necessity. Without judges, every man must have taken care of himself: without any power to appeal to the law, he must have resorted to force. To that extent, and a most grave and serious one, society would have been resolved into barbarism. We are not *116 at liberty to suppose that the members of the convention were insensible of these mischievous consequences, or that they coulcl have been willing to bring them upon the people of the State. ¥e must suppose that they intended to guard against inconvenience and mischief, during the interval referred to, by providing the necessary officers for the performance of judicial duties, and the schedule must be construed accordingly, if the language will allow such a construction. The schedule is not to be subjected to a strict and literal construction when that will tend to mischievous consequences; it should be construed liberally, to “ suppress the mischief and advance the .remedy.” Here, as we have seen, there is no occasion to contradict the meaning of the words, or to wrest them out of their ordinary sense; we have only to determine which of two ordinary senses is to be put upon the word “courts”; a sense which must lead to a construction full of mischief, without any possible good, or a sense that will accomplish a highly convenient and beneficial result.
The schedule must be presumed, in the absence of anything to show the contrary, to have been intended to cover the whole period between the expiration of the former constitution and the organization of the judicial department of the present constitution; to apply to every part of that period. The 4th section of the schedule provides for recognizances, bonds, &c., “which may be entered into or executed under existing laws, to the people of the State of Virginia, to any such officer or public body, before the complete organization of the department of government under this constitution.” “All crimes, misdemeanors, and penal actions, shall be tried, punished, and prosecuted, as though no change had taken place, until otherwise provided by law.” Does not this section contemplate bonds and recognizances taken in court ? The greater part of such bonds and recognizances are taken in court. And how are *117 crimes to be tried, prosecuted and punished, except through the agency of courts? Every man is entitled to a speedy trial. It might well happen, if no courts could be held during the interval I am speaking of, that a party accused of crime would be held in custody, without the possibility of trial, for an unreasonable and oppressive length of time. A man might be ruined for want of an injunction or appeal, or cruelly oppressed for want of a writ of error or habeas corpus; the people would be subjected to all the evils of a suspension of the courts, which are too numerous and various to admit of enumeration.
It has been said, however, that the convention could not have intended to continue the judges over, because those who were then in office were obnoxious to them politically, and were the subjects of disfranchisements inserted in the constitution. Admit that the incumbents, at the time of the adoption of the constitution, were thus obnoxious; I submit it affords no ground for judgment upon the question I am considering. The convention knew that the commanding general had the amplest power of removal and appointment; that he had already exercised his power in relation to the chief executive and other officers; and they no doubt hoped and believed that he would exercise it as to other officers.
The convention could not tell how long the admission of the State to representation might be delayed. They could not possibly know but that most, if not all, of the offices would, at that time, be filled by military appointees. In point of fact, every judgeship, except one or two, was so filled at the time the State was admitted. The convention was desirous that the State government should be organized as soon as practicable, and accordingly passed an ordinance providing for submitting the constitution to the people on the 2nd day of June, 1868, and for an election of State officers *118 and members of the general assembly at the same time. The convention knew, however, that it had no autho- - rity to carry this ordinance into effect; and it accordingly requested the. commanding general to do so. They may have designed, therefore, that there should be no interval between the inauguration of the constitution and the organization of the government under it; that the officers should all have been elected when ■ the constitution took effect. But they must have known that the commanding general might decline, as he did, to carry this ordinance into effect. And that they contemplated that there might be such an interval, seems to be manifest from the fact that they thought it proper, if not necessary, to adopt a schedule.
Besides, a mere conjecture, founded upon the known or supposed political opinions or prejudices of the majority of the members of the convention, is not a proper guide to the construction of the schedule. Unless-the contrary should be made plainly to appear, if not indeed even then, we must give the convention credit for good faith, and an honest desire to provide for the public welfare, and must construe the schedule according to the rules which we apply to other instruments of like character.
When I first heard the opinion of my brother Anderson in November last, I thought that he made good the proposition that the schedule did not apply to the judges, and I consequently laid that subject out of my mind. I have now reconsidered it, however, giving full attention to the views of judge Anderson. The result of my best reflection is, a confident opinion that the-schedule does embrace the judges, and authorized the judges of the .Court of Appeals to sit at the time those decrees were rendered. I say nothing of the length of time that they were so entitled to sit. Whether they were entitled to act as judges until the regular election and qualification of judges under the con *119 stitution, or whether the Legislature might remove them hy the appointment of judges ad interim, or hy a declaration that their places shall be deemed vacant, need not be considered; because the Legislature had not, before the 25th day of February, undertaken to effect their removal in any form; nor did they do so at any other time, until they made a regular election of judges for the term provided for by the constitution.
In the case of the mayoralty, this court used the following language: “ The incumbents of office, at the time of an organic change of government, continuing to hold over after such change (in the absence of a provision of the new constitution, or of an act of the Legislature of the new government, giving them such authority), hold by sufferance only, and upon a principle of public necessity or convenience, not in virtue of any individual or private right. They cannot set up any claim against the Legislature, which has ample power to put an end to their official authority at any time, and appoint others to take their places, subject only to any constitutional restrictions which may appear to exist.” This language clearly implies that the mayor, who did not come within the scope of the schedule, had “ official authority ” while he thus held over by sufferance, so that his acts, otherwise lawful, done during that period, were valid. Chief Justice Chase applied the same principle to the common council of Harrisonburg, in the case of Woodson v. Fleck, 9 Am. L. Reg. N. S. 435. He said: “ It is to be borne in mind that the members of the common council of Harrisonburg had been elected to that office while the insurgent government of Virginia was in entire control of that portion of the State. When that government was dispersed by the superior force of the United States, the civil authorities did not necessarily cease at once to exist. They continued in being de facto, charged with the duty of maintaining order, until sus *120 pended by the regular government. Thus the common council of Harrisonburg remained charged with the - government of the town, notwithstanding the temporary occupation of the place by the United States forces. Doubtless it might be superseded. The government of the United States was not bound to recognize any authority which originated under the rebel government. But it was not superseded.” These ' views were founded upon public necessity; the salus populi; the great inconvenience and mischief resulting from a state of anarchy. A like principle was acted upon by the Supreme court of the United States in Cross v. Harrison, 16 How. U. S. R. 164. California was acquired by conquest in 1846. In 1847 a civil and military government over the conquered country was established by authority of the President, with power to impose duties on imports and tonnage. Duties were imposed accordingly, by a war tariff, under which they were collected until notice was received by the governor of the conclusion of the treaty with Mexico, whereby California had been ceded to the United States. The ’governor directed that duties should be thereafter collected in conformity with such as were, by the acts of Congress, to be paid in other parts of the United States, though no act had been passed extending the revenue system over California. This was approved by the Executive department of the government of the United States. Mr. Buchanan, Secretary of State, in a despatch, expressed himself as follows : “ In the meantime, (that is, until Congress should legislate on the subject of a territorial or other government for California,) the condition of the people of California is anomalous, and will require, on their part, the exercise of great prudence and discretion. By the conclusion of the treaty of peace, the military govern-, ment, which was established over them by the laws of war, as recognized by the practice of civilized nations, *121 has ceased to derive its authority from this source of power. But is there, for this reason, no government in California ? Are life, liberty and property under the protection of no existing authorities ? This would be a singular phenomenon in the face of the world, and especially among American citizens, distinguished as they are, above all other people, for their law-abiding character. Fortunately, they are not reduced to this sad condition. The termination of the war left an existing government, or government de facto, in full operation, and this will continue, with the presumed consent of the people, until Congress shall provide for them a territorial government. The great law of necessity justifies this conclusion. The consent of the people is irresistibly inferred from the fact that no civilized community could possibly desire to abrogate an existing government, when the alternative presented would be to place themselves in a state of anarchy, beyond the protection of all laws, and reduce them to the unhappy necessity of submitting to the dominion of the strongest.”
A suit was brought against the collector, to recover back the amount of certain duties paid to him, between February 3, 1848, the date of the -treaty of peace, and November 13,1849, the time when the collector, appointed by the President, according to law, entered on his duties, on the ground that they had been illegally collected. The Supreme court held, that the duties were lawfully collected; that the government established during the war, by right of conquest, was lawfully established; that it was the existing government when the conquered territory was ceded to the United States, and did not cease, as a matter of course, or as a consequence of the restoration of peace, and that it was rightfully continued after peace was made, and until Congress legislated otherwise by providing another government.
*122 The continuance of the judges and other officers of the military government in Virginia, to perform their duties after the 26th of January, 1870, was universally acquiesced in by the people. They realized the necessity of practical government, to avoid a state of anarchy, and did not trouble themselves about nice questions.
Their salaries were regularly paid by the State. The governor made no complaint. The Legislature assembled on the 14th day of February, 1870. The governor, in his message, did not call the attention of the Legislature to the continuance of these officers as-
a usurpation. The Legislature did not remonstrate against their continuance, or undertake to prevent it. The first thing the Legislature did upon the subject, was on the 22d day of February, 1870, when a joint resolution was passed, declaring the office of judge Burnham, of the Court of Appeals, to be vacant. It is well known that this declaration was based on the ground that he held an office under the United States, and was, therefore, disqualified under the constitution and statutes of Virginia. Nothing was said about the other judges. Could there be a stronger implication, that the Legislature regarded judge Burnham as holding the place of a judge of the State of Virginia? Else, why apply to him a test of competency prescribed by the laws of Virginia? And, is it not plainly to be inferred, that they considered the other judges as holding lawfully, when they did not declare their offices vacant likewise ? Then came the act of March 5,1870. That act approved the course of the officers in holding over, declared them to be legal officers, and their acts valid.
Under all these circumstances, it seems to me that these officers must be regarded as de facto officers, whose acts are valid in respect to the public and third persons. A de facto government may exist without *123 any color of authority. Thus the Supreme court treats the governments of the seceded States during the war as unlawful—mere usurpations; and yet they regard them as de facto governments, whose acts are valid and binding as to matters connected with the internal, domestic economy of the States, not inconsistent with the constitution and laws of the United States. Texas v. White, 7 Wall. U. S. R. 700; Thornington v. Smith, 8 Wall. U. S. R. 1.
So the government established over Virginia by the reconstruction acts, did not come into existence by any color of authority from the laws of Virginia. And yet, was it not a de facto government; were not its officers de facto officers, whose acts were valid as to the public and third persons ? Is not that construction demanded by the most imperious necessity, whatever may be thought of the constitutional. power of Congress to pass the reconstruction acts ? Is it possible that the acts of all officers under that government are to be held void ? Ho man can comprehend the full extent of the mischief that would result from such a doctrine. The Legislature did not entertain that opinion, for it did not think it necessary to confirm what was done under that government.
This opinion has extended to such length, that I will not prolong it further. My opinion is, that the motion to review the decrees in these cases ought to be overruled, and the decision made by us on the 14th Hovember, 1870, should be adhered to.
Christian and Staples, Js., adhered to the opinions they had expressed.
Moncure, P. and Anderson, J., adhered to their opinions.
Motion to rehear refused.